COMMONWEALTH *vs.* JOSE A. MEDINA.

No. 08-P-1821.

Plymouth. November 8, 2011. - April 4, 2012.

Present: BERRY, BROWN, & GRAINGER, JJ.

*Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Mayhem. Practice, Criminal,* New trial, Assistance of counsel, Duplicative convictions, Instructions to jury. *Evidence,* Opinion, Self-defense, Prior inconsistent statement, Credibility of witness. *Self-Defense. Witness,* Credibility.

At a criminal trial, no substantial risk arose that the defendant's convictions of assault and battery by means of a dangerous weapon with respect to two victims were based on the same acts as his convictions of mayhem with respect to each victim, where, as to one victim, it was clear at trial that the mayhem charge was based on the vicious attack to her face after she had succumbed to multiple stab wounds; and where, as to the other victim, evidence was presented that the defendant sliced that victim's fingers and arm, leaving a disfiguring injury, while the rest of the defendant's blows were directed primarily to that victim's head, neck, and back; further, the judge's instructions clearly differentiated the two offenses. [528-531]

At a criminal trial, no substantial risk of a miscarriage of justice arose from the admission of testimony by a lay witness regarding the extent of her injuries and their subsequent effects, where the evidence was unrelated to any live issue at trial, and the defendant did not articulate how the evidence influenced the result; moreover, the admission of such evidence did not give rise to any claim of ineffective assistance of counsel. [531]

At the trial of indictments charging armed assault with intent to murder, mayhem, and assault and battery by means of a dangerous weapon, the judge properly instructed the jury on the proportionality element of self-defense [531-532]; further, the judge's instruction regarding the permitted use of prior inconsistent statements did not limit the jury's consideration of the defendant's video-recorded statement [532-533]; finally, there was no merit to the claims that the judge's correct instruction that disbelief of a witness's testimony does not constitute evidence of the contrary proposition prevented the jury from considering the victims' purportedly false statements as evidence of consciousness of guilt [533-534], or that the instruction on considering one victim's past behavior in determining who was the first aggressor was unduly narrow [534].

A Superior Court judge properly denied the criminal defendant's motion for a new trial based on ineffective assistance of counsel, where, even assuming that counsel, in cross-examining one of the victims, should not have tried

to confirm the defendant's version of events, the defendant did not show how this information (which was unrelated to any live issue at trial) deprived him of an otherwise available and substantial ground of defense; where counsel was not ineffective for failing to call the defendant's mother as a witness to impeach that victim; and where there was no merit to the defendant's summary claim that counsel was unprepared. [534-535]

INDICTMENTS found and returned in the Superior Court Department on August 7, 2006.

The cases were tried before *Elizabeth B. Donovan,* J., and a motion for a new trial, filed on October 29, 2009, was heard by her.

*David Hirsch* for the defendant.

*Carolyn A. Burbine,* Assistant District Attorney, for the Commonwealth.

BROWN, J. The defendant was convicted of two counts of the lesser included offense of armed assault with intent to kill, two counts of mayhem (second branch), and two counts of assault and battery by means of a dangerous weapon.[1] The defendant moved for a new trial, arguing that trial counsel was ineffective. The trial judge denied the motion and the defendant appealed. We consolidated his appeal from the denial of that motion with his direct appeal, in which the defendant presents the additional claims that (1) his two convictions of assault and battery by means of a dangerous weapon were duplicative of his two mayhem convictions, (2) the victim was not properly qualified to testify about her medical condition, and (3) the jury instructions were flawed.

We summarize the facts the jury could have found, leaving certain details for discussion with the relevant issue.

At about 6:00 P.M. on February 20, 2006, the defendant entered his cousin's apartment, where he had been staying for several days. In addition to his cousin, Brenda DeJesus, her four year old son and her boyfriend, Justin Ferrier, lived in the apartment. Ferrier testified that shortly thereafter, he came out of the bedroom to light a cigarette, and the defendant asked for help getting something he had dropped under the bathroom sink. As

---

[1] An indictment for armed assault in a dwelling was dismissed because there was no evidence of an illegal entry.

Ferrier bent down, the defendant grabbed his forehead and tried to slice his throat with a six-inch steak knife. Ferrier got his fingers between the blade and his neck, and the defendant sliced his fingers and gouged his forearm. The defendant accused Ferrier of robbing him. After cutting his fingers, the defendant started stabbing Ferrier in the head, neck, and face, while telling Ferrier he was a gangster. At one point when the defendant stabbed Ferrier in the temple, the blade snapped off the handle and fell to the floor. The defendant and Ferrier then struggled to get the blade. The defendant got it and continued to stab Ferrier.

From the bedroom, DeJesus heard a scuffle. She later realized it was coming from the bathroom. There, she saw the defendant standing over Ferrier, punching him, as Ferrier was on the floor trying to cover his head with his arms. It was only when she got closer, and tried to push the defendant away, that he turned on her and she could see he was holding a knife. The defendant tried to cut her throat and then stabbed her head, the back of her neck, and her fingers. The more she fought the angrier the defendant became, until finally she was on the floor. He told her he "would get [her] where it would hurt [her]" and sliced her face.

DeJesus's four year old son, who was watching, screamed and yelled for the defendant to stop. The defendant stopped for a minute, and DeJesus played dead; she then crawled to her son, grabbed him, and fled the apartment. She went to a neighbor's apartment on the second floor. The defendant and Ferrier fought for a few more seconds, before the defendant stopped and ran out of the bathroom. Ferrier followed and asked him where DeJesus was. The defendant said, "Fuck her. She's dead." Ferrier followed the blood trail to the second-floor apartment. There, he saw DeJesus with her son. Ferrier estimated the defendant had stabbed him more than fifteen times.

The police were dispatched to the scene at about 7:00 P.M. and arrived before the ambulance. They saw bloody footprints all over the floor. The most blood was in the bathroom, all over the room and on the door. The knife handle was stuck on the shower curtain in a pool of blood. Officer Vardaro began to administer first aid to DeJesus, who was covered in blood and appeared to be losing consciousness. Officer Czarnowski at-

tended to Ferrier, who was in the kitchen. Vardaro saw blood coming out of DeJesus's back and put pressure on those wounds. When Vardaro tried to replace the small washcloth on DeJesus's face because blood was pouring out of it, "her cheek had stuck to that towel and pulled away and [Vardaro] could see right into her teeth through the side."[2]

DeJesus and Ferrier were initially taken to Brockton Hospital, but they were quickly transferred to Boston hospitals. DeJesus went to Brigham and Women's Hospital, where she remained for five days. Ferrier was admitted to Beth Israel Hospital, where he was also treated for approximately five days.

The defense called no witnesses but played for the jury a video recording of the defendant's interview with the police.[3] In his statement, the defendant claimed that shortly after he entered the apartment, Ferrier asked to talk to him in the bathroom. When he went into the bathroom, Ferrier was bending down and accused the defendant of taking Ferrier's Oxycontin pills. According to the defendant, Ferrier lunged at him and was trying to stab him with a knife. DeJesus joined the fray and jumped on his back. The defendant described "these two people jumping on me. One is choking me and the other is trying to stab me. So I snapped the knife . . . ." Then he "blacked out." The defendant said both Ferrier and DeJesus were "all fucked up [on Oxycontin]" and that he was afraid they were "going to kill me." The next thing he remembered was seeing a lot of blood. He told the police that he "would never hurt his cousin."

*Discussion.* 1. *Duplicative convictions.* The defendant argues that his conviction of assault and battery by means of dangerous weapon on DeJesus is duplicative of the mayhem conviction related to DeJesus. He repeats the claim with respect to the same charges involving Ferrier. Because this issue was not raised below, the defendant must show that the error, if any, created a substantial risk of a miscarriage of justice. See *Com-*

---

[2]DeJesus testified to the serious extent of her injuries, and her medical records and photographs of her appearance after the attack were put in evidence.

[3]The recording was admitted in evidence, but not played, during the Commonwealth's case. The recording is before the panel and we have viewed it. Additionally, the defendant has included a transcription of the recording in his record appendix.

monwealth v. *King*, 445 Mass. 217, 225 (2005), cert. denied, 546 U.S. 1216 (2006).

Assault and battery committed by means of a dangerous weapon is a lesser included offense of second-branch mayhem,[4] as charged here. See *Commonwealth* v. *Martin*, 425 Mass. 718, 721-723 (1997). Convictions of both the greater and lesser offenses are permitted as long as they "rest on separate and distinct acts." *Commonwealth* v. *King*, 445 Mass. at 225. See *Commonwealth* v. *Berrios*, 71 Mass. App. Ct. 750, 753 (2008).

Here, although the better practice would have been for the judge to instruct the jury specifically that the convictions had to be based on separate acts, see *Commonwealth* v. *Maldonado*, 429 Mass. 502, 509 (1999), the jury nonetheless received substantial guidance as to how they should view the evidence. We thus discern no reversible error (if error at all) in this regard.

With respect to DeJesus, it was clear at trial that the mayhem charge was based on the vicious attack to her face. Only after DeJesus had succumbed to multiple stab wounds and had fallen to the floor did the defendant tell her that he "would get [her] where it would hurt [her]" and drive the knife into her face hard enough to separate a portion of her cheek from her head. This blow stood in stark contrast to the other wounds he inflicted, not merely because of the accompanying statement and the wound's severity, but because the wound was to her face, an area of the body for which a disfiguring injury is particularly egregious. See *Commonwealth* v. *Drew*, 67 Mass. App. Ct. 261, 262 (2006) (undisputed that damage to victim's face, caused by contact with heater, was of type contemplated by mayhem statute); *Commonwealth* v. *McPherson*, 74 Mass. App. Ct. 125, 128-129 (2009) (targeting of face with baseball bat).

The prosecutor emphasized in his closing argument what was obvious from the evidence, that with respect to the mayhem charge, the defendant's statement when "he slice[d] her face open" was instructive. We note that when defense counsel moved

---

[4]"[T]he second branch of the mayhem statute, G. L. c. 265, § 14, . . . applies to 'whoever, with intent to maim or disfigure, assaults another person with a dangerous weapon, substance or chemical, and by such assault disfigures, cripples or inflicts serious or permanent physical injury upon such person.' " *Commonwealth* v. *Drew*, 67 Mass. App. Ct. 261, 262 (2006).

for a required finding of not guilty, he impliedly recognized that the defendant's statement combined with the injury to DeJesus's face was the basis for the mayhem charge.[5]

With respect to Ferrier, the evidence may have been less dramatic, but it was no less clear. During the opening struggle, the defendant sliced Ferrier's fingers and arm, leaving a disfiguring injury. The rest of the defendant's blows were directed primarily to Ferrier's head, neck, and back. The prosecutor drew the jury's attention to these two separate and distinct series of blows in his closing argument when he stated that the defendant "slashe[d] at the hand so much that it injure[d] the hand. And there is a photograph. It shows the gouge in Mr. Ferrier's forearm that resulted from that. And then he continue[d] to stab him. Multiple stab wounds to the shoulder, to the chest, to the temple."[6]

The likelihood that the jury would have differentiated the separate and distinct acts that maimed DeJesus and Ferrier from the multiple additional stab wounds inflicted upon them by the defendant is bolstered by the judge's instruction on the elements of both offenses. With respect to mayhem, the judge used the term "maim" or "disfigure" no fewer than eighteen times to describe the crime and specifically instructed no fewer than six times that the offense requires proof of an injury that "disfigures, cripples, or inflicts serious or permanent physical injury." In contrast, the judge instructed the jury that the crime of assault and battery by means of a dangerous weapon requires a "touching" of the victim, "however slight," and that the touching must be committed by means of a dangerous weapon.

---

[5]In his argument on the motion, defense counsel plainly acknowledged that the evidence of a specific intent to maim DeJesus was sufficient to go to the jury, and he instead focused on the purported lack of evidence to prove a specific intent to maim Ferrier.

[6]Although the photographic trial exhibits showing Ferrier's injury have not been made part of the record on appeal, it is clear from the trial transcript that they depict significant scarring on his hand. In addition to the prosecutor's statement recited above, which notably drew no objection, the prosecutor relied on the photographs during the bench conference addressing the defendant's motion for a required finding of not guilty. The prosecutor argued that "the pictures show that [Ferrier] received grievous injuries to the fingers, [and] to the forearm." The defendant did not dispute the point; rather, he argued the evidence of intent to cause those injuries was lacking.

In sum, the presentation of the evidence that elucidated a series of separate and distinct acts, combined with the prosecutor's closing argument and the judge's instructions that clearly differentiated the two offenses, leads us to conclude there was no substantial risk of the convictions of mayhem being based on the same acts as were the convictions of assault and battery by means of a dangerous weapon. See *Commonwealth* v. *Drew*, 67 Mass. App. Ct. at 265; *Commonwealth* v. *Jackson*, 80 Mass. App. Ct. 528, 530 (2011).

2. *Medical testimony.* DeJesus testified without objection that in the two years that followed, a knife wound she had suffered to her throat during the incident, which had "cut into [her] main artery," led to further tearing of the artery and caused her "to have a stroke and have to have reconstructive surgery on [her] main artery." The defendant argues that only a properly qualified expert is competent to give such testimony and that its erroneous admission created a substantial risk of a miscarriage of justice. We disagree, as the evidence was unrelated to any live issue at trial. Even if we assume that the testimony should have been excluded, the defendant has not articulated how the evidence influenced the result, nor do we discern any such effect from the record.[7]

On the appeal from the denial of his motion for new trial, the defendant's argument pressed under the rubric of ineffective assistance fares no better. See, e.g., *Commonwealth* v. *Balliro*, 437 Mass. 163, 170 (2002).

3. *Jury instructions.* The defendant argues that the judge gave improper instructions in the following four instances.

a. *Self-defense.* The defendant argues on appeal, as he did at the conclusion of the judge's final instructions to the jury, that the judge should have included additional language specifically elucidating factors relevant to the third element of self-defense — the so-called proportionality element — in conformity with

---

[7]Other than the single statement by the victim, this testimony was not mentioned again during the trial, and the prosecutor omitted any reference to the injury during his closing argument. Perhaps most demonstrative of its non-prejudicial effect is the jury's conviction of the defendant on only the lesser included charge of armed assault with intent to kill on the indictment alleging armed assault with intent to murder.

the teaching of *Commonwealth* v. *Kendrick*, 351 Mass. 203, 212 (1966).[8]

The third element of self-defense, as correctly explained by the judge, is that the defendant "must have used no more force than was reasonably necessary in the circumstances to defend himself." See *id.* at 211. While it would have been advisable to accede to the defendant's request, we discern no reversible error in the circumstances of the case.

The judge repeatedly instructed the jury on all three elements of self-defense,[9] including the above definition of the third element, and the defendant does not contend otherwise. The defendant has not shown that more was required here.[10] See *Commonwealth* v. *Caramanica*, 49 Mass. App. Ct. 376, 378 (2000), quoting from *Commonwealth* v. *Berrio*, 43 Mass. App. Ct. 836, 838 (1997) ("A trial judge is not constrained to put the instructions into any particular words; 'rather, [the judge] is required only to provide a full and accurate explanation of the governing law applicable to a particular case' ").

b. *Witness's prior statements.* Contrary to the defendant's contention on appeal, the judge's instruction to the jury regarding the permitted use of prior inconsistent statements did not

---

[8]The defendant sought an instruction substantially reciting the following language of *Kendrick*:

> "In passing upon the reasonableness of the force used by the defendant, . . . the jury should consider evidence of the relative physical capabilities of the combatants, the characteristics of the weapons used, and the availability of maneuver room in, or means of escape from, the . . . area."

*Commonwealth* v. *Kendrick*, 351 Mass. at 212. See *Commonwealth* v. *Shaffer*, 367 Mass. 508, 512 (1975).

[9]Where self-defense is raised, the Commonwealth bears the burden of proving beyond a reasonable doubt the negation of at least one of three elements. See *Commonwealth* v. *Glacken*, 451 Mass. 163, 167 (2008), where the three elements are rehearsed.

[10]There was overwhelming physical evidence of the defendant's use of excessive force. See *Commonwealth* v. *Proulx*, 61 Mass. App. Ct. 454, 464 (2004), quoting from *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5 (1986) ("[N]o harm accrues to a defendant if an error [in instruction] does not relate to an issue actively contested at trial"). We note that on the indictments charging armed assault with intent to murder, the jury returned verdicts of armed assault with intent to kill, an outcome consistent with their instructions on the effect of a finding of excessive force.

limit their consideration of the defendant's video-recorded statement. The judge gave the following explanation to the jury:

> "[I]f a person comes into court and makes a statement on a particular topic, and had previously given a statement on the same topic, . . . and the two statements are inconsistent with each other, then we will allow into evidence the statement that was given before the trial on the issue of whether you wish to believe the trial testimony of that witness."

The jury would not have applied this instruction to the defendant's recorded statement where he clearly did not testify at trial. Moreover, the judge explicitly informed the jury that the evidence in the case consisted of "the testimony of the witnesses" and "forty-one exhibits." The defendant's recorded statement was among the forty-one exhibits; it was not introduced as a prior inconsistent statement. The prosecutor began his closing argument with the observation that the defendant's "statement is in evidence. And that evidence can be evaluated by you when you think about this case."

c. *Disbelief of a witness.* The defendant concedes, as he must, that the judge correctly instructed the jury in accordance with *Commonwealth* v. *DiRusso*, 60 Mass. App. Ct. 235, 241 (2003), that "disbelief of a witness's testimony does not constitute evidence of the contrary proposition." The defendant argues however, somewhat confusingly, that this instruction prevented the jury from considering their disbelief of DeJesus's and Ferrier's testimony as proof that their version did not happen and, therefore, prevented the jury from considering their statements as evidence of consciousness of guilt.

As already mentioned, disbelief of any statement — including, in this case, disbelief of the victims' testimony that they were injured during an entirely unprovoked attack — does not alone establish the opposite conclusion. See *Commonwealth* v. *Michaud*, 389 Mass. 491, 498 (1983); *Commonwealth* v. *Camerano*, 42 Mass. App. Ct. 363, 367 (1997).

To the extent the defendant claims the instruction prevented the jury from using the victims' purportedly false statements as consciousness of guilt evidence, the claim misses the mark.

Consciousness of guilt evidence,[11] by definition, is only relevant where it permits an inference of *a defendant's guilt* of the crime charged. See *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008), quoting from *Commonwealth* v. *Toney*, 385 Mass. 575, 584 & n.4 (1982). Consciousness of guilt evaporates as an evidentiary tool in the absence of a charged crime.

d. *First aggressor instruction.* The judge instructed the jury in accordance with *Commonwealth* v. *Adjutant*, 443 Mass. 649, 664 (2005), that they could properly consider Ferrier's past behavior in determining who was the first aggressor. The defendant contends that drawing and using the knife is an act that is additional to being the "first aggressor" and that absent an explanation that being the first aggressor *may include drawing* and using the knife, the instruction is unduly narrow. The defendant parses the language too finely. The instruction and the term "first aggressor" include within it the notion of an individual being the first one to draw and use the weapon without a separate explanation to that effect. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998), quoting from *Commonwealth* v. *Perez*, 390 Mass. 308, 313 (1983) (we do not parse language of judge's final instructions and "scrutiniz[e] bits and pieces removed from their context"). There was no error.

4. *Motion for new trial.* The defendant argues that the trial judge erred in denying his motion for new trial grounded on the following claims of ineffective assistance.[12]

a. *Cross-examination and impeachment.* The defendant told police that he had moved in with his cousin a few days earlier and was able to protect her from her boyfriend when he tried to hit her. Discovery revealed, however, that Ferrier had reported to the police that the defendant was living there because his mother had thrown him out of her house several days earlier. The defendant argues on appeal, therefore, that counsel was

[11]In an effort to bolster his statement that the victims attacked him first, the defendant offered evidence that Ferrier had two prior convictions of assault and battery by means of a dangerous weapon.

[12]The defendant's first claim of ineffective assistance has been addressed in part 2, *supra*, where we concluded that counsel was not ineffective for failing to object to the victim's single reference to the attack having led to her suffering a stroke two years later.

ineffective when he asked DeJesus whether she had invited the defendant to stay with her and she responded, "He came to me and asked if he could stay with me. My aunt, his mother, threw him out of the house." The defendant also argues that counsel exacerbated the problem by then asking, "You didn't ask [the defendant] to come stay with you because you were having problems with [Ferrier]?" to which she responded, "No, I did not. He came and asked me if he could stay. He had nowhere to go." Even if we assume counsel should not have tried to confirm the defendant's version of events, the defendant has not shown how this information, unrelated to any live issue at trial, deprived him of "an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). Counsel even had some success in bolstering the defendant's account when he elicited from Ferrier that in the two days preceding this incident, he (Ferrier) and DeJesus had been fighting and Ferrier had not slept there for a couple of nights.

Nor was counsel ineffective for failing to call the defendant's mother as a witness, to impeach DeJesus on the basis that his mother did not throw him out. See *Commonwealth* v. *Fisher,* 433 Mass. 340, 357 (2001) ("Generally, failure to impeach a witness does not amount to ineffective assistance of counsel").

b. *Failure to prepare.* The defendant's summary claim that errors outlined above occurred because of counsel's lack of preparation fails for the reasons already noted.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*